# 24-2078-cv

## United States Court of Appeals

*for the*

## Second Circuit

GWENDOLYN CLARK,

*Plaintiff-Appellant,*

— v. —

HEMPHILL ARTWORKS, LLC, doing business as Hemphill Fine Art, GEORGE HEMPHILL, MNUCHIN GALLERY LLC, JOHN DOES 1-5, ABC CORPS 1-5,

*Defendants-Appellees,*

DOGWOOD BLOSSOM ALONG SKYLINE DRIVE,
1973, oil on canvas, 60x54 in, by Alma Thomas,

*Defendant-in-rem-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

CARTER REICH
CARTER REICH, P.C.
*Attorneys for Plaintiff-Appellant*
106 West 32nd Street, Suite 123
New York, New York 10001
(917) 615-0978

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

PRELIMINARY STATEMENT .........................................................1

JURISDICTIONAL STATEMENT .....................................................3

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................4

STATEMENT OF THE CASE.............................................................4

SUMMARY OF ARGUMENT .........................................................14

STANDARD OF REVIEW ...............................................................15

ARGUMENT ..................................................................................17

    I.     The District Court abused its discretion in finding that laches
         bars a cause of action brought within the statute of limitations..........17

    II.    The District Court abused its discretion in finding that Gwen
         unreasonably delayed in bringing this action......................................19

    III.   The District Court abused its discretion in finding that
         Appellees have been prejudiced.........................................................25

CONCLUSION ...............................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Avni v. Sothebys,
2024 N.Y. Misc. LEXIS 7; 2024 N.Y. Slip Op. 30004(U)
(N.Y. Cnty. Jan 2, 2024)...............................................................28

Broecker v. Widows Sons Grand Ch. The King's Guard Inc.,
2021 U.S. Dist. LEXIS 220254 (W.D.N.Y. Nov. 15, 2021,
No. 21-cv-6309 (CJS)) ................................................................30

Brown v. Quiniou,
467 F. App'x 13 (2d Cir. 2012) ....................................................15

Conopco, Inc. v. Campbell Soup Co.,
95 F.3d 187 (2d Cir. 1996) ............................................. 15, 16, 18

Cooter & Gell v. Hartmarx Corp.,
496 U.S. 384, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) ...........16

DeSilvio v. Prudential Lines, Inc.,
701 F.2d 13 (2d Cir. 1983) ...................................................... 15, 30

Eppendorf-Netheler-Hinz GMBH v. Nat'l Sci. Supply Co.,
14 F. App'x 102 (2d Cir. 2001) ....................................................15

Goodman v. Universal Beauty Prods.,
2018 U.S. Dist. LEXIS 39176 (S.D.N.Y. Mar 9, 2018, No. 17-cv-
1716 (KBF))...................................................................................18

Harlequin Enters. Ltd. v. Gulf & W. Corp.,
644 F.2d 946 (2d Cir. 1981) .........................................................31

Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,
83 Civ. 5401 (DC), 1997 U.S. Dist. LEXIS 7234, 1997 WL 278116
(S.D.N.Y. May 23, 1997) ..............................................................18

Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,
219 F.3d 104 (2d Cir. 2000) ..................................................... 15, 30

Hicks v. Leslie Feely Fine Art, LLC,
2021 U.S. Dist. LEXIS 49212 (S.D.N.Y. Mar 16, 2021, 20-cv-
1991(ER)) ............................................................................... *passim*

Ikelionwu v. United States,
    150 F.3d 233 (2d Cir. 1998) ............................................................ 15, 17, 18

ILGWU Nat'l Ret. Fund v. Smart Modes of Cal., Inc.,
    735 F. Supp. 103 (S.D.N.Y. 1990) ...................................................18

In Design v. Lauren Knitwear Corp.,
    782 F. Supp. 824 (S.D.N.Y. 1991) ........................................... 20, 26

Ivani Contracting Corp. v. City of New York,
    103 F.3d 257 (2d Cir.), cert. denied, 137 L. Ed. 2d 821,
    117 S. Ct. 1695 (1997)................................................................. 15, 18

Jaghory v. New York State Dept. of Educ.,
    131 F.3d 326 (2d Cir. 1997) ............................................................15

Kamat v. Kurtha,
    2008 U.S. Dist. LEXIS 107102 (S.D.N.Y. Apr 14, 2008) ..................... 20, 26

Kawatra v. Medgar Evers Coll. of City Univ. of NY,
    700 F. Supp. 648 (E.D.N.Y. 1988) ...................................................29

L.A. Printex Indus., Inc. v. Doe,
    543 F. App'x 110 (2d Cir. 2013) ......................................................16

Lehman Bros. Holdings, Inc. v. Giddens,
    2021 U.S. App. LEXIS 27241 (2d Cir. Sep. 10, 2021, Nos. 19-3245,
    20-3757)......................................................................................16

Moreschi v. DiPasquale,
    58 A.D.3d 545, 872 N.Y.S.2d 108 (2009)......................................26

Nihon Keizai Shimbun, Inc. v. Comline Bus. Data Inc.,
    166 F.3d 65 (2d Cir. 1999) .............................................................31

Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,
    324 U.S. 806, 89 L. Ed. 1381, 65 S. Ct. 993 (1945) ......................31

Reif v. Nagy,
    107 A.D. 107 (1st Dep't 2019) .......................................................30

Republic of Turkey v. Christie's, Inc.,
    62 F.4th 64 (2d Cir. 2023) ..............................................................17

Sims v. Blot,
    534 F.3d 117 (2d Cir. 2008) ...........................................................16

_Taberski v. Taberski_,
    153 N.Y.S.3d 871 (4th Dep't) ....................................................26

_United States v. Portrait of Wally_,
    2002 U.S. Dist. LEXIS 6445 (S.D.N.Y. Apr. 11, 2002, 99 Civ. 9940
    (MBM)) ................................................................................ 20, 21

_United States v. Mack_,
    295 U.S. 480, 55 S. Ct. 813, 79 L. Ed. 1559 (1935) ....................18

_United States v. Milstein_,
    401 F.3d 53 (2d Cir. 2005) ..........................................................18

_United States v. RePass_,
    688 F.2d 154 (2d Cir. 1982) ........................................................18

_Wagner v. Metro. Life Ins. Co._,
    2011 U.S. Dist. LEXIS 74954 (S.D.N.Y. Feb. 28, 2011) .............18

_Wertheimer v. Cirker Hayes Storage Warehouse, Inc._,
    300 A.D.2d 117 (1st Dep't 2002) ................................................22

_Zervos v. Verizon New York, Inc._,
    252 F.3d 163 (2d Cir. 2001) ........................................................16

_Zuckerman v. Metro Museum of Art_,
    928 F.3d 186 (2d Cir. 2019) ........................................................22

**Statutes & Other Authorities:**

28 U.S.C. § 1332(a)(1) .......................................................................3

CPLR § 301 .......................................................................................3

CPLR § 302(a) ...................................................................................3

Federal Rule of Civil Procedure 12(b) ..............................................15

Federal Rule of Civil Procedure 12(b)(1) .........................................15

Federal Rule of Civil Procedure 12(b)(6) .............................. 14, 15, 16

Snyder, Rachel Louise, _Who Gets to Kill in Self Defense_, New York
    Times, Opinion, September 15, 2024 ............................................1

iv

Stockman, J. K., Hayashi, H., & Campbell, J. C. (2015). Intimate Partner
    Violence and Its Health Impact on Ethnic Minority Women. *Journal*
    *of Women's Health*, *24*(1)............................................................................2

*The National Intimate Partner and Sexual Violence Survey* (NISVS):
    2010 Summary Report (Atlanta: National Center for Injury
    Prevention and Control, Centers for Disease Control and
    Prevention, 2011)......................................................................................2

*The National Intimate Partner and Sexual Violence Survey* (NISVS):
    2016-2017 Summary Report (Atlanta: National Center for Injury
    Prevention and Control, Centers for Disease Control and
    Prevention, 2022)......................................................................................2

## PRELIMINARY STATEMENT

For decades, the news cycle has regrettably been filled with stories about the victims of domestic violence, and, more specifically, how the courts routinely fail the victims of violence at the hands of an intimate partner when it comes to assessing the reasonableness of their actions or unwillingness to act.

> The question of what seems reasonable to a court of law can be messy, too. She can read the signs of danger: Maybe one night he's quiet and subdued when he's usually loud, or he's loud when he's usually quiet. He tells her to drive the car when usually he demands to drive. He orders her to leave the kids or get the kids or any number of situations in which there is a departure from a norm she has come to know through experience and intuition. To her, these are screaming alarms, but how to convey this in ways that sound reasonable to strangers who exist outside this couple's specific emotional, psychological, physiological and physical reality?[1]

The Centers for Disease Control (CDC) which tracks statistics on the demographics of intimate partner violence (IPV) has found, among other things, that 80% of women who experience domestic violence by an intimate partner experience significant short- or long- term effects including post-traumatic stress disorder (PTSD), and that, "survivors of domestic violence in court may continue to experience ongoing danger, coercion, and custody-related threats, which can

---

[1] Snyder, Rachel Louise, <u>Who Gets to Kill in Self Defense</u>, New York Times, Opinion, September 15, 2024.

exacerbate traumatic impacts.[2] The CDC has also found that over half (53.8%) of non-Hispanic Black women have experienced IPV with over a third of those victims experiencing PTSD.[3] Numerous other studies have found that "the psychological impact of IPV on ethnic minority women includes higher rates of depression, [PTSD], low-self esteem, and suicidality…."[4]

In the instant matter, the District Court abused its discretion and erroneously applied the doctrine of laches in finding that Plaintiff- Appellant Gwendolyn Clark unreasonably delayed in pursuing her violent and abusive husband. Not only did the District Court apply the doctrine erroneously to Gwen's timely bad-faith conversion claim, it should not have made a finding of laches at the pleading stage given the history of abuse Gwen suffered, but rather sent the matter to discovery to fully vet the reasonableness of her actions.

Furthermore, the District Court erred in assuming that Appellees have been prejudiced rather than requiring a showing of actual prejudice, and the District Court erred in allowing Appellees to invoke laches when they had prior knowledge

---

[2] *The National Intimate Partner and Sexual Violence Survey* (NISVS): 2010 Summary Report (Atlanta: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, 2011).

[3] *The National Intimate Partner and Sexual Violence Survey* (NISVS): 2016-2017 Summary Report (Atlanta: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, 2022).

[4] Stockman, J. K., Hayashi, H., & Campbell, J. C. (2015). Intimate Partner Violence and Its Health Impact on Ethnic Minority Women. *Journal of Women's Health*, *24*(1), 62–79.

of Gwen's claims. At a minimum, the District Court was obligated to send the matter to discovery to determine if Appellees were actually prejudiced.

In finding laches at the pleading stage, the District Court did not treat all of Plaintiff's allegations as true and it did not afford her every reasonable inference. In doing so, the District Court failed Gwendolyn Clark, rather than properly adjudicating the "messy" issue of reasonableness. She deserved more from the District Court than to have her claims summarily discredited as being unreasonably delayed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 USC § 1332(a)(1), in that this is a civil action between a citizen of Virgina and businesses incorporated in and at home in Washington DC and New York. The amount in controversy exceeds $75,000, exclusive of costs. As such, diversity is satisfied. The District Court had personal jurisdiction over Appellees pursuant to New York CPLR §§ 301 and 302(a) because they each transacted business in the Southern District of New York giving rise to the claims asserted herein.

On March 13, 2024, the District Court denied Plaintiff- Appellant's request for oral argument (A-104) and issued an Opinion and Order on March 16, 2024 (A-74), which granted Appellees' motions to dismiss and denied Appellant's cross-motion to file an amended complaint. The District Court entered the Judgment

3

appealed from on March 18, 2024. A-106. On July 8, 2024, the District Court denied Appellant's motion for reconsideration. A-107. Plaintiff-Appellant noticed her appeal on August 5, 2024. A-108. This Court has appellate jurisdiction because this appeal is from a final judgment entered in the United States District Court for the Southern District of New York.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the District Court abuse its discretion in finding that laches bars a cause of action brought within the statute of limitations?

2. Did the District Court abuse its discretion in finding that Gwen unreasonably delayed in bringing this action?

3. Did the District Court abuse its discretion by not requiring the Appellees invoking laches to demonstrate actual prejudice?

4. Did the District Court abuse its discretion in finding laches when Appellees were on notice of Gwen's claim?

## STATEMENT OF THE CASE

Gwendolyn Clark, now 83 years old, retired in 2015 after a 21-year career as an educator at Howard University followed by a 25-year career in government. A-35. She married Wallace Clark on Jul 18, 1970, and they had their only child, Erika, the following year. They permanently separated in 1981 but never got divorced. A-36. Wallace died in 2008 without a will or formal estate. Id.

4

Gwen and her late husband purchased Alma Thomas's "Dogwood Blossom Along Skyline Drive" (the "Work") on May 12, 1976, from the Franz Bader Gallery in Washington, DC, for $3,500. Id. A copy of a letter from Franz Bader Gallery to Alma Thomas dated May 20, 1976, confirms that the Work was sold "to Mr. *and* Mrs. Wallace Clark." Id., A-12, A-47. [Emphasis added.]

Gwen had never purchased artwork from a gallery before and it was a large amount of money for them so the gallery allowed them to make a down payment of $800 followed by monthly payments of $300, so it would be paid off in approximately 9 months. A-36. However, Wallace Clark soon would stop contributing financially to their marriage, so Gwen paid the bulk of the purchase price from her own account to the Franz Bader Gallery – taking over two years to do so. Id.

Prior to her permanent separation from Wallace in the fall of 1981, Gwen was frequently and severely abused by him- physically, emotionally, and psychologically. Wallace struck her in the face, violently kicked her body out of her own home, and discarded most of her belongings. She lived in constant fear. A-12, A-37. This abuse lasted for years, and it took multiple restraining orders against her late husband before this cycle of abuse would end. A-37. Gwen believes she has repressed most of the memories of this abuse. Id.

As part of his psychological and emotional abuse, in addition to throwing away all of her clothing, Wallace Clark removed all of the prints and paintings from the marital home in the fall of 1981, including the Work. A-12, A-37. On November 10, 1981, Gwen was forced to flee her home with her infant daughter. A-37. She hired an attorney to bring an action against Wallace for custody of their daughter, child support and maintenance, and for the Work to be returned to the marital home along with the other paintings that Wallace took. Id.

That action resulted in the entry of a Consent Order dated February 19, 1982 (A-26), that permitted Gwen to reside in the marital home, required Wallace to pay monthly support and maintenance, and gave him visitation rights with their daughter that he never sought to enforce. A-12, A-37. The Consent Order also required "Plaintiff" to return all jointly owned paintings to the martial home, but this is unfortunately a scrivener's error that went undetected until late 2019. A-37-38, A-48.

It would take over a year before Wallace left the marital home as required by the Consent Order meaning Gwen spent approximately two years displaced from her home moving from place to place with her young daughter because it was not safe to be around Wallace. A-38. Wallace Clark never fully complied with the Consent Order but once he was finally out of her life Gwen understandably did not pursue the Work further out of fear and because she did not want to jeopardize the

small amounts of money she sporadically received from Wallace, which she desperately needed to survive. A-38. Gwen had no personal contact with her abusive husband after their separation, because she was understandably afraid of him and whenever she was around him, she was under constant duress that he would severely injure or kill her or their daughter. A-12, A-37-38.

Gwen timely pursued her husband to recover possession of the Work. She did not sit on her rights. However, as a single mother on a teacher's salary, she could not afford to hire a lawyer every time Wallace should have been held accountable. A-38-39.

Besides, when Gwen and her husband purchased the Work it was their intention to always be with it so she reasonably believed that he would not dispose of the Work. Id. The Work had great sentimental value to Wallace, who was a musician and the Director of the music program at the Duke Ellington School of the Arts in Washington, DC. Id., A-13. Out of an abundance of caution and hope, Gwen began making inquiries about the Work in the 1990s but learned nothing which seemed to confirm that Wallace still had possession, and this made sense to Gwen, who did not think Wallace would sell the Work (or be able to sell the Work) while in violation of the Consent Order.  A-12-13. For these reasons, Gwen was certain that he still had possession of the Work at the time of his death in 2008, when he died without a will or formal estate and while still married to her. Id.

Gwen instructed her daughter to retrieve the Work from Wallace's home, but she could not find it. A-13.

This was because unbeknownst to Gwen, without her permission, and while he was in violation of the Consent Order, Wallace consigned the Work back to the Franz Bader Gallery on or about October 18, 1983, for $6,000, before changing his mind and selling it to Franz Bader Gallery a week later for $5,500. Gwen would not learn this information until May 2022. A-13, A-45, A-63. Significantly, this information, like so much other information regarding the Work and its provenance, is still available but the District Court instead chose to assume that too much information has been lost.

After her daughter graduated high school and left for college, Gwen could devote more time to searching for the Work, but by this time the Franz Bader Gallery was no longer in business and she was unaware that the gallery's materials were available at the Smithsonian Archives until Mary Early, Director of Appellee Hemphill Fine Art, told her in 2016. A-39. It was during this meeting that Mary Early expressed a desire and willingness to help locate the Work, affirmatively stating to that she would contact Gwen if she learned anything. A-13, A-39-40. Gwen graciously accepted and a few months later, Mary sent her a note on Hemphill Fine Art letterhead with photocopies of the archival material she had found when she visited the Smithsonian Archives on Gwen's behalf, which was

unfortunately inconclusive. A-13, A-40, A-50. Significantly, Mary Early confirmed at this time that she could find no public record of the Work. Id.

After dealing with some serious health issues, Gwen visited the Smithsonian Archives in October 2018, hoping to find some documentation of what became of the Work but all she found was an unsigned statement dated October 25, 1985, from Franz Bader Gallery to Wallace purporting to buy the Work for $5,500. However, because this document was unsigned, Gwen reasonably believed that Wallace did not go through with the sale. A-14, A-40, A-53.

With no public record of the Work and the information available in the Smithsonian Archives being inconclusive, Gwen did all that could have been reasonably expected of her, which was to continuously search the internet for any sign of the Work. A-14, A-40. All efforts proved fruitless until late 2018, when Gwen's daughter learned that the Work had been offered for auction in June 1990 at Weschler's Auction House in the Washington, DC area, but had not been sold. Id. Mary Early then introduced Gwen to an expert on Alma Thomas, who in turn referred her to a senior employee at Weschler's Auction House. A-40-41. Unfortunately, when Gwen contacted the employee at Weschler's to try and learn the identity of the consignor in 1990, she learned that those records are no longer available. A-14, A-40-41.

By this time Gwen was no longer the only one looking for the Work.

Appellee Mnuchin Gallery contacted Gwen's daughter, Erika, in January 2019, inquiring if the Work was still in her father's collection. A-14, A-41, A-54. Erika immediately contacted Mnuchin and informed a Partner there, in no uncertain terms, that the Work was never just in her father's collection, rather it was jointly owned by both her parents, as they had purchased it together. She further told the Mnuchin Gallery Partner that her father had taken the Work from the family home without her mother's consent and that her mother had been searching for the Work for many, many years. A-14, A-41-42.

Mnuchin Gallery ignored Gwen's daughter's request for help in locating the Work and thereafter tried to act like Gwen never existed, despite receiving the Work on consignment after learning of her claim of ownership. Id. Completely lost on the District Court was that Mnuchin Gallery had enough information available to them in 2019, to trace the ownership of the Work back to Gwen and her late husband.

Gwen registered the Work with the Art Loss Registry in January 2019, after this was recommended to her by a New York City gallery owner, Michael Rosenfeld, as he too could find no public information about the Work. A-14-15, A-41-42. Prior to his recommendation, Gwen had never heard of the Art Loss Registry. A-42. This would prove fortuitous as Gwen was contacted by the Art Loss Registry on August 27, 2019, and informed that an art gallery in the United

States had recently searched for the Work. A-15, A-42. When she contacted Michael Rosenfeld on September 3, 2019, to relay this information, he informed her that the Work was in New York City and included in an Alma Thomas retrospective exhibition opening the following week at Mnuchin Gallery. A-15, A-42.

Mnuchin Gallery did not exhibit the work at Gwen's request but shortly thereafter negotiations broke down and Gwen has no idea what happened to the Work after September 4, 2019, other than it was presumably sold on consignment. A-15-16, A-18, A-42-43, A-55. Again, this information is in the exclusive possession of the Appellees, who admit their roles in the sale and consignment of the Work yet refuse to disclose any information citing disingenuous professional obligations. A-43. Thus, it was simply not possible at the pleading stage for the District Court to make a finding of actual prejudice without full knowledge of what the Appellees knew and when.

On September 5, 2019, Gwen went to Hemphill Fine Art to thank Mary Early for her help over the years and to inform her that the Work had surfaced in New York at Mnuchin Gallery. A-15-16, A-43. Surprisingly, she and Appellee George Hemphill, told Gwen that they wanted to "come clean" and proceeded to admit that Hemphill Fine Arts had sold the Work and then consigned it to Mnuchin Gallery earlier that year, with full knowledge that

11

Gwen had been looking for the Work. Id.

This understandably came as a shock and betrayal to the Gwen, who thought the Hemphill Appellees were helping her locate the Work and in fact had taken significant steps in providing this assistance. Gwen justifiably relied on Mary Early's representations that she would be contacted if the Hemphill Appellees had any information regarding the Work's whereabouts. A-16, A-19, A-20, A-43-44.

George Hemphill admitted to Gwen that a client came to him in June 2019, requesting assistance in selling the Work and despite the client calling the Work something different, he admitted to seeing "Dogwood Blossom Along Skyline Drive" inscribed on the back confirming that the painting was, in fact, the Work. A-16, A-43-44. Ignoring obvious red flags, Hemphill also admitted that his client was unable to provide clear provenance to the Work, calling the story "colorful". A-16, A-44.

Again, underscoring that there was and is sufficient information available about the Work so as not to prejudice Appellees, George Hemphill would go on to tell Gwen that there have been as many as three possessors of the Work after Wallace but refused to provide additional information. A-16, A-45, A-56. At a minimum, the Hemphill Appellees admitted that they sold the Work in 2019, and then represented the new possessor in consigning and shipping the Work to

12

Mnuchin Gallery so that it can be sold again. A-44-45. The Appellees knew that Gwen had been searching for the Work to assert her claim of ownership and they chose to transact business with it anyway hoping that she would just go away. A-45. This fact alone renders the doctrine of laches unavailable to Appellees.

The Franz Bader Gallery was fully aware that the Work was jointly owned–their own letter to Alma Thomas acknowledges this. The gallery also was fully aware in 1983 that Gwen was the one who had been making payments for the Work, from her own account, for over two years. *A*-45. Based on these facts alone it should have been apparent to the gallery that Wallace, acting alone, did not have the authority to consign or sell the Work. Id. Furthermore, the fact that Wallace apparently agreed to consign the Work to the Franz Bader Gallery for $6,000, only to accept less money in a sale to the gallery a week later- suggesting a sudden urgency to dispose of the Work- should have been questioned by the gallery and should have prompted the gallery to contact Gwen. Id. The Franz Bader Gallery ignored these red flags and as a result the Work was lost, without any public record of its whereabouts, until September 3, 2019. Id.

Clearly, given these facts, Gwen could not demand the return of the Work from the possessor until she learns their identity, which the Appellees have refused to disclose. However, on October 21, 2019, Gwen's prior counsel wrote to counsel representing the anonymous then- possessor that "Gwen Clark wants her painting

returned". Prior counsel for the Hemphill Appellees was copied on this email and responded that same day that "[t]his is the first that I have heard that Gwen Clark wants her painting returned." A-46, A-65. On October 25, 2019, counsel for the anonymous possessor rejected this demand and threatened to sue Gwen to quiet title to the Work if she did not withdraw her claim to the Work by November 1, 2019. Id. The possessor never sued to quiet title, Gwen never withdrew her claim, and she timely commenced this action less than three years later.

By Judgment appealed from entered on March 18, 2024, and reaffirmed on July 8, 2024, the District Court, Hon. Paul G. Gardephe, USDJ, granted Appellees' motions to dismiss in lieu of an answer pursuant to FRCP 12(b)6. This appeal followed.

## SUMMARY OF ARGUMENT

This Court should vacate the District Court's judgment and reinstate Plaintiff-Appellant's causes of action for bad-faith conversion, replevin and declaratory judgment because her claims accrued less than three years before she brought this action and are therefore timely rendering a finding of laches improper. Furthermore, whether Plaintiff-Appellant unreasonably delayed in bringing her claims can and should have only been determined after discovery. Finally, the District Court erred in finding that Appellees were prejudiced without requiring Appellees to demonstrate "actual" prejudice or requiring them to disclose what

14

they knew and when they knew it. Moreover, because they chose to convert the work for their own benefit *after* learning of Plaintiff-Appellant's claims, any prejudice suffered is self-inflicted and inadequate to sustain a finding of laches.

## STANDARD OF REVIEW

Whereas courts reviewing a finding of laches typically employ an abuse of discretion standard, the Second Circuit has not yet settled on an appropriate standard to review a finding of laches. In Ikelionwu v United States, 150 F3d 233 (2d Cir 1998), this Court wrote:

> Initially, we note that we have not yet settled definitively the appropriate standard to review the grant of a motion to dismiss, under Federal Rule of Civil Procedure 12(b), based on laches. Ordinarily, we review *de novo* a dismissal under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). *See Jaghory v. New York State Dept. of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). We have stated, however, [*237] that the district court's determination of whether laches bars a plaintiff from equitable relief "will only be disturbed upon a showing of an abuse of discretion." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193 (2d Cir. 1996) (reviewing Rule 52(c) grant of judgment based on partial findings); *see DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 15 (2d Cir. 1983) (summary judgment). *But see Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir.) (reviewing *de novo* grant of summary judgment based on laches), *cert. denied*, 137 L. Ed. 2d 821, 117 S. Ct. 1695 (1997).

Id. at 236-237. See also Brown v Quiniou, 467 F App'x 13, 14-15 (2d Cir 2012) comparing Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000) (applying *de novo* review), with Eppendorf-Netheler-Hinz GMBH v. Nat'l Sci. Supply Co., 14 F. App'x 102, 105 (2d Cir. 2001) (summary order)

(applying abuse of discretion review (citing <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 193 (2d Cir. 1996))).

More recently, this Court held that it was not necessary to determine which standard of review applies to a finding of laches, because the appellant's claims failed under the "more-exacting" de novo standard. See <u>Lehman Bros. Holdings, Inc. v Giddens</u>, 2021 U.S. App. LEXIS 27241, at *5, n 7 (2d Cir Sep. 10, 2021, Nos. 19-3245, 20-3757).

As recognized in this Circuit,

> An abuse of discretion could consist of an erroneous view of the law or a clearly erroneous assessment of the evidence, <u>see, e.g., Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990), or a decision that, while not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions, [*112] <u>see, e.g., Sims v. Blot</u>, 534 F.3d 117, 132 (2d Cir. 2008); <u>Zervos v. Verizon New York, Inc.</u>, 252 F.3d 163, 169 (2d Cir. 2001).

<u>L.A. Printex Indus., Inc. v Doe</u>, 543 F App'x 110, 111-112 (2d Cir. 2013). On the other hand, "[w]hen we review a district court's decision *de novo*, … our review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though the matter had come to the courts for the first time." <u>Zervos v Verizon NY, Inc.</u>, 252 F3d 163, 168 (2d Cir 2001).

Given these inconsistencies, and given the fact that the dismissal of Plaintiff-Appellant's Complaint was under Rule 12(b)6, this Court should review the

decision of the District Court under the more-exacting de novo standard. However, even if this Court employs an abuse of discretion standard, it should nevertheless still find that the District Court both erroneously applied the doctrine of laches, and erroneously assessed the evidence before it.

## ARGUMENT

### I.    The District Court abused its discretion in finding that laches bars a cause of action brought within the statute of limitations.

This Court's recitation of the elements of laches in <u>Republic of Turkey v. Christie's, Inc.</u>, 62 F. 4th 64* (2d Cir. 2023), demonstrates the District Court's clear error and abuse of discretion in finding laches.  "To prevail [on a laches defense], a defendant must establish '(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."  <u>Id</u>. at 71 (citing <u>Ikelionwu v. U.S.</u>, supra., 150 F. 3d at 237). The District Court misapplied these factors finding that because Plaintiff-Appellant knew of her abusive husband's misconduct in 1982-1983, and did not take further action against him, that Appellees have been prejudiced decades later. This is an erroneous application of the doctrine of laches. Rather, had the District Court applied the correct standard, it would have found that laches does not apply because Gwen first learned of the Appellees' 2019 bad-faith conversion in the fall of 2019, and then timely commenced this action without unreasonable delay.

17

Indeed, in <u>Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.</u>, 83 Civ. 5401 (DC), 1997 U.S. Dist. LEXIS 7234, 1997 WL 278116 at *2 (S.D.N.Y. May 23, 1997), Judge Chin of this Court recognized that it is "the law of this Circuit that laches may not be asserted as a defense if the applicable statute of limitations has not run (citations omitted)". See <u>Goodman v Universal Beauty Prods.</u>, 2018 U.S. Dist. LEXIS 39176, at *18 (S.D.N.Y. Mar 9, 2018, No. 17-cv-1716 [KBF]) ("The defense of laches is not available against a claim made within an express statutory limitations period….") See also <u>Wagner v Metro. Life Ins. Co.</u>, 2011 US Dist LEXIS 74954, at *22-23 (SDNY Feb. 28, 2011), collecting cases:

> [T]he Second Circuit has held that "[l]aches is not a defense to an action filed within the applicable statute of limitations." <u>United States v. RePass</u>, 688 F.2d 154, 158 (2d Cir. 1982), <u>citing United States v. Mack</u>, 295 U.S. 480, 489, 55 S. Ct. 813, 79 L. Ed. 1559 (1935); <u>see also United States v. Milstein</u>, 401 F.3d 53, 63 (2d Cir. 2005) (the "well established . . . general rule" is that laches is no defense within limitations period); <u>Ivani Contracting Corp. v. City of New York</u>, 103 F.3d 257, 260 (2d Cir. 1997) ("The prevailing rule, then, is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely."); <u>ILGWU Nat'l Ret. Fund v. Smart Modes of Cal., Inc.</u>, 735 F. Supp. 103, 106 (S.D.N.Y. 1990) (Patterson, D.J.) ("[I]t is well-established that, where the applicable statute of limitations has not yet [*23] expired, the defense of laches is inapplicable.") (citations omitted)). <u>But see Ikelionwu v. United States</u>, 150 F.3d 233, 238 (2d Cir. 1998) ("[I]f the applicable legal statute of limitations has not expired, there is rarely an occasion to invoke the doctrine of laches . . . ."); <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 191 (2d Cir. 1996) ("When a suit is brought within the time fixed by

the analogous statute, the burden is on the defendant to show . . circumstances exist which require the application of the doctrine of laches." (citation omitted)).

In the instant matter, the District Court correctly found that Plaintiff-Appellant has stated a valid cause of action against Appellees for bad-faith conversion (A- 98), and it is beyond dispute that Gwen could not have brought any claim against Appellees until they converted the Work and Gwen found out about it – both of which happened in 2019. Therefore, it was erroneous for the District Court to apply the doctrine of laches. For this reason alone, the District Court's finding of laches must be reversed.

## II. The District Court abused its discretion in finding that Gwen unreasonably delayed in bringing this action.

There was no unreasonable or inexcusable delay from the time Plaintiff-Appellant learned of Appellees misconduct to when she commenced this action rendering laches inapplicable. Yet, in determining that all of Gwen's claims are barred by the doctrine of laches, the District Court concluded that she inexcusably slept on her rights from 1983 until 2008 by not pursuing her abusive and estranged husband for the return of the Work. The District Court found that because Gwen had pursued her husband in Court in 1982 for the return of the Work to the marital home, and again in 1983 for financial relief unrelated to the Work, that there was nothing stopping her from pursuing him for the Work in the years that followed.

19

Of course, other than fear and duress, possible PTSD, legal fees, and the utter futility her prior efforts had yielded.

As this Court is aware, "[w]hether a plaintiff's conduct constitutes laches is a question of fact 'to be drawn from the equitable circumstances peculiar to each case.' [Citation omitted]." In Design v Lauren Knitwear Corp., 782 F. Supp. 824, 831 (S.D.N.Y. 1991). "[W]here the facts must be construed in a light most favorable to Defendant, the Court cannot conclude as a matter of law that Defendant's claim to the Painting is barred by the doctrine of laches." Kamat v Kurtha, 2008 US Dist LEXIS 107102, at *20 (S.D.N.Y. Apr 14, 2008). See also Hicks v. Leslie Feely Fine Art, LLC, 2021 U.S. Dist. LEXIS 49212*28 (S.D.N.Y. Mar 16, 2021, 20-cv-1991(ER) (Defendants' motion to dismiss on laches grounds was denied as premature because "[t]o determine whether the Gallery was unduly prejudiced by the delay would require factual considerations that reach beyond the face of the Complaint.")

Because the doctrine of laches "involve a fact-intensive inquiry into the conduct and background *of both parties* in order to determine the relative equities", the District Court was required, but failed to consider factual considerations that reach beyond the face of the Complaint, to wit, the conduct and background of Appellees. United States v Portrait of Wally, 2002 US Dist LEXIS 6445, at *70 (S.D.N.Y. Apr. 11, 2002, 99 Civ. 9940 [MBM]). Emphasis added.

The District Court was required to accept as true Gwen's recitation of her ownership history of the Work, how she acquired it jointly with her husband, how it could not be located after her husband passed away in 2008, and how she found out, for the first time in 2022, that her husband had consigned it back to the Franz Bader Gallery without her knowledge or permission in 1983. A-36, A-39, A-45, A-47, A-63. Documentation from the Franz Bader Gallery establishes these facts beyond refute. Id. The fact that Plaintiff-Appellant did not continue to pursue her violent husband for possession of the Work during his lifetime in no way extinguished her ownership interest or granted him permission to sell the Work without her approval. Allowing her husband to reside with the Work during his lifetime was entirely reasonable given his violent nature, history of abuse, willingness to ignore court orders, and the burdensome cost of hiring lawyers every time he refused to comply. A-38-39.

Plaintiff-Appellant permanently separated from her husband in 1981, but they were never divorced. The consent order that she obtained in 1982 against her husband merely directed that the Work should be returned to the marital home. It did not give ownership of the Work to Gwen or her husband, rather it dealt solely with possession while recognizing the Work as marital property. Thus, the only right that Plaintiff-Appellant could have slept on was the right to possess the Work in the marital home during her marriage. She was under no obligation to police her

21

husband or assert her ownership interest during their marriage if she reasonably believed that he would not sell or dispose of the Work and especially considering that she was in fear for her life. It was wholly inappropriate for the District Court to completely discount the fear she had of her abusive husband. Regardless, nothing in the 1982 or 1983 court orders gave Wallace Clark ownership of the Work or the right to dispose of it - in fact quite the opposite.

Given that the Work was at all times marital property, it should be of no consequence where it was located or who possessed it. Nevertheless, the District Court also overlooked the fact that when Gwen returned to court in 1983 to try and get some financial assistance from her husband, she had not yet moved back into the marital home and therefore did not know that the Work was still missing.

Once her husband died and the Work could not be located, her efforts to locate it were reasonable for a full-time teacher and single mother. The fact that she ultimately did locate the Work in 2019, and that there is no documented exhibition history for the Work prior to this time, is a testament to the reasonableness of Gwen's efforts, which had been continuous for years.

The cases relied upon by the District Court in finding Gwen's actions unreasonable are easily distinguished and do not support a finding of laches. In both Wertheimer v. Cirker Hayes Storage Warehouse, Inc., 300 A.D.2d 117, 118 (1st Dept. 2002) and Zuckerman v. Metro Museum of Art, 928 F.3d 186, 192-194

(2d Cir. 2019), the contested artworks had been on display at major galleries and museums for decades, and were therefore easily locatable. Whereas here, the Work had no exhibition history prior to September 2019 when it resurfaced at Appellee Mnuchin Gallery. In comparing the facts of the instant matter to those of Sanchez v. Trustees of Univ. of Pennsylvania, No. 04 CIV 1253 (JSR), 2005 WL94847, at *3 (S.D.N.Y. Jan 18, 2004), where the extent of plaintiff's efforts to locate an artwork was visiting unspecified galleries and asking unspecified individuals for a period of 32 years, the District Court discredited and trivialized the detailed allegations of the Complaint and in Gwen's affidavit as to the extensive efforts she undertook to locate the Work. Significantly, the issue of laches in Sanchez, as in most cases, was only decided after discovery.

The facts in the instant matter are analogous to the facts in Hicks v. Leslie Feely Fine Art, LLC, supra. 2021 U.S. Dist. LEXIS 49212, and therefore the District Court should have reached the same conclusion as Judge Ramos in Hicks, when he found defendant's laches argument premature. Id. at *2, et seq. In Hicks, the plaintiff is a painter who sued to recover possession of an artwork that she had created in 1981 and which hung in the home she shared with her partner, renowned artist Friedel Dzubas until 1991, when Hicks was driven out of the house by Dzubas's children and a new partner. Id. at *2-*3. Hicks was only able to bring her living necessities with her. Id. Despite this, she continued to use the art studio

23

connected to the house but eventually Dzubas's children and new partner denied her access to the studio as well – only giving her one day to retrieve her belongings. Id. Hicks did not feel comfortable going into the main house again and therefore her painting stayed there after her departure. Id. Dzubas would die in 1994, Hicks's painting was attributed to Dzubas, and it was purchased by a third-party in 2003. Id. In 2017, the painting was consigned to the defendant art gallery which sold the painting to an anonymous collector as an authentic work by Dzubas on May 18, 2017. Id. at *4. Hicks commenced her action for conversion against the defendant gallery and replevin against a John Doe defendant on March 5, 2020. Id. The District Court held that the complaint stated timely causes of action for conversion and replevin and that the defendant's motion to dismiss based on laches was premature. Id. at *26, *28.

This is similar to the instant matter, where Plaintiff-Appellant was driven from her home and separated from the Work she owned, through violence. It was not just that Gwen felt "uncomfortable" around her husband, which was apparently enough to excuse Hicks from doing anything to retrieve her painting for 29 years – Gwen was legitimately afraid for her safety and the safety of her daughter. In Hicks, there is no mention of what steps she failed to take or could have taken before she commenced her action to recover her painting, because these issues are incapable of being fully reviewed at the pleading stage. As such, the District Court

24

should have reached the same decision as it did in <u>Hicks</u>, and Appellees' laches argument, at a minimum, should have been denied as premature.

The District Court's finding of laches also begs the question- what lawsuit or action was Plaintiff-Appellant supposed to take during Wallace Clark's life when she already co-owned the Work with him, and what action was she supposed to take, and against who, once the Work could no longer be located? The reality is that Gwen did not deliberately or inexcusably delay in bringing any lawsuit.

These facts, among other, should have been viewed in a light most favorable to Plaintiff-Appellant and they were not. It would have been impossible for the District Court to reach the conclusion it did, at the pleading stage, if it had accepted Gwen's factual recitation as true and granted her every favorable inference. It did not, and in failing to do so, it condoned the actions of an abusive husband while blaming the victim. For these reasons, the District Court abused its discretion in finding laches and should be reversed.

### III. The District Court abused its discretion in finding that Appellees have been prejudiced.

The District Court erred in finding that Appellees have been prejudiced as a matter of law. Significantly, in addition to requiring that a plaintiff knows of a defendant's misconduct and inexcusably delays in taking action against that defendant, a finding of laches also requires that the defendant suffers actual

prejudice as a result of the delay. See In Design v Lauren Knitwear Corp., supra., 782 F. Supp. at 831 ("The party asserting the laches defense must establish … that the delay resulted in prejudice.") See also Kamat v Kurtha, supra., 2008 U.S. Dist. LEXIS 107102, at *15 ("However, '[l]ack of diligence, standing alone, is insufficient to support a claim of laches; the party asserting the claim also must establish that it was prejudiced by the delay.' [citation omitted]."); Moreschi v. DiPasquale, 58 A.D.3d 545, 872 N.Y.S.2d 108 (2009)(defendant failed to show he was prejudiced by plaintiff's alleged undue delay in asserting her claim, as required for affirmative defense of laches; and Taberski v. Taberski, 153 N.Y.S.3d 871 2021 (4ᵗʰ Dept) ("The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches")

Considering this, it was clearly erroneous for the District Court to assume prejudice to the Appellees, and not require a showing of actual prejudice as required to sustain a laches defense. See In Design v. Lauren Knitwear Corp., supra., 782 F. Supp. at 831-832. (While the prejudice suffered by a defendant asserting laches may be real, unless the record contains evidence substantiating that prejudice, a motion to dismiss at the pleading stage should be denied.)

It is also a completely disingenuous argument for Appellees to say they have been prejudiced because documents and witnesses are lost, which is simply not true. Appellees assert this argument while in possession of most, if not all of the

26

relevant information about the Work, sales history, and the identity of its current and past possessors. After all, Mnuchin Gallery was able to trace the provenance of the Work all the way back to Gwen's daughter. A-41, A-54. When George Hemphill came clean and confessed that he had sold the Work for a long-time client knowing full well that Gwen had been searching for it, he told her that the Work had three past possessors. A-44, A-56.

The fact that the Franz Bader Gallery is defunct, and has been since 1995, does not automatically equate to prejudice, and there is no prejudice, because 70 years' worth of records from the Franz Bader Gallery are still available[5] and credibly establish that "Mr. & Mrs. Wallace Clark" purchased the Work in 1976 and that Wallace Clark, only, consigned it back to the Franz Bader Gallery in 1983, at a time when he was living separate from Gwen and in violation of the Consent Order to return the Work to the marital home. A-47, A-63. Considering that Gwen had personally paid most of the purchase price to the Franz Bader Gallery over a period of 2 years until it was finally paid in full (A-36, A-45), the gallery ignored glaring red flags when accepting the work on consignment from Wallace Clark.

---

[5] https://www.aaa.si.edu/collections/franz-bader-gallery-records-6608 ("The records of the Washington, D.C. located Franz Bader Gallery measure 13.0 linear feet and date from 1925 to 1995."), last accessed April 21, 2024. Thirteen linear feet of documents is approximately 23,400 pages.

The fact that Wallace Clark is deceased does not prejudice the Appellees at all either as he was not a witness *to their misconduct*, which took place more than a decade after he passed away. There is nothing for him to add and Appellees are in no way prejudiced by his absence. More importantly, most key witnesses are still alive, including the Plaintiff-Appellant, her daughter, and her counsel from the 1980s, who can all attest to the fear she was living in, her limited ability to hire a lawyer every time her husband failed to comply, and her efforts to search for the Work.

Indeed, there are plenty of instances where decades have passed, people have passed away, entities come and gone, and prejudice is not assumed as a matter of law- especially at the pleading stage. The death of Friedel Dzubas 26 years before the plaintiff in <u>Hicks</u>, discussed above, commenced her action did not equate to prejudice as a matter of law. Recently, in <u>Avni v. Sothebys</u>, 2024 N.Y. Misc. LEXIS 7 *; 2024 NY Slip Op 30004(U)** (N.Y. Cty Jan 2, 2024), the New York State Supreme Court correctly determined that prejudice had not been established as a matter of law, despite the fact that decades had passed and witnesses were no longer available, noting that "Respondent's claims… largely amount to objections that could be raised as defenses in a case brought by petitioners. But they do not utterly refute petitioners' allegations." <u>Id.</u> at *15 - *16.

Here, neither Appellee made any showing of prejudice, which is required to sustain a laches defense, and all of Appellees' objections based on laches amount to defenses to Plaintiff-Appellant's claims. In reality, the Appellees have not been prejudiced nor can they be. Not only did Appellees come into possession of the Work with knowledge of Gwen's claim of ownership, but they also came into possession of the Work in 2019, and this lawsuit was thereafter timely commenced. Thus, the District Court's assertion that memories have faded, and evidence lost as a result of Plaintiff-Appellant's laches have no bearing on her claims, which involve the tortious acts and omissions of the Appellees less than three years prior to the commencement of this action.

Perhaps more importantly, Appellees cannot establish that they suffered actual prejudice because they knew about Plaintiff-Appellant's claims before they converted the Work. This is because you cannot claim prejudice when the harm is self-inflicted. See Kawatra v Medgar Evers Coll. of City Univ. of NY, 700 F. Supp. 648 (E.D.N.Y. 1988) (claim of prejudice unconvincing where the harm was self-inflicted.)

In the instant matter, the District Court acknowledged and was required to accept as true the allegation in the Complaint that the Appellees "bought, sold, transferred, consigned, and/or exhibited the Work *after* learning that Plaintiff claimed ownership and had been searching for the Artwork for many years." A-18.

29

Emphasis supplied. As such, it was erroneous to conclude that the doctrine of laches is available to the Appellees if they had prior knowledge that Gwen was searching for the Work to assert a claim of ownership.

In <u>Reif v. Nagy</u>, 107 AD 107 (1st Dept. 2019), which involved claims of replevin and conversion by the heirs of a well-known Jewish Viennese art-collector whose entire collection was looted by the Nazis in 1938, a laches defense could not be maintained because the defendant, who acquired the contested artworks in 2013, was aware that the heirs were asserting a claim ownership prior to his purchase. <u>Id</u>. at 130. ("Significantly, Nagy was on notice of plaintiffs' claims to the Grünbaum collection prior to the purchase….") See also <u>DeSilvio v. Prudential Lines, Inc.</u>, 701 F.2d 13 (2d Cir. 1983) (this Court held that the District Court abused in discretion in dismissing a personal injury action brought by a Longshoreman because the defendant had been on notice of the plaintiff's claim) and <u>Broecker v Widows Sons Grand Ch. The King's Guard Inc.</u>, 2021 U.S. Dist. LEXIS 220254, at *18 W.D.N.Y. Nov 15, 2021, No. 21-CV-6309 (CJS)(laches does not apply to bar registration of a trademark where the defendants were clearly on notice that the plaintiff's contested their registration.)

As stated by this Court in <u>Hermes Intl. v Lederer de Paris Fifth Ave., Inc.</u>, supra., 219 F. 3d at 107:

 [T]he district court misapplied the law governing the doctrine of laches. It is well established that "laches is not a defense against

30

injunctive relief when the defendant intended the infringement." <u>Harlequin Enters. Ltd. v. Gulf & W. Corp.</u>, 644 F.2d 946, 950 (2d Cir. 1981); <u>see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data Inc.</u>, 166 F.3d 65, 75 (2d Cir. 1999) (quoting <u>Harlequin</u>). This good-faith component of the laches doctrine is part of the fundamental principle that "he who comes into equity must come with clean hands." <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.</u>, 324 U.S. 806, 814, 89 L. Ed. 1381, 65 S. Ct. 993 (1945). Thus, the appellees' intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in balancing the equities, as the district court did in this case.

Both the Hemphill and Mnuchin Appellees were aware that Plaintiff-Appellant was searching for the Work and asserting an ownership claim *before* they converted the Work for their benefit. So even if Appellees did change their position and suffered prejudice as a result of Gwen's delay in bringing suit, they did so with knowledge of her claims. Therefore, Appellees cannot avail themselves of the laches defense because this good-faith component is lacking.

Regardless, a party invoking laches should not be allowed to feign prejudice while withholding information that likely destroys the defense, and this is precisely the reason why laches cannot be determined at the pleading stage. For these reasons the District Court's finding of laches was clearly erroneous and must be reversed.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Judgment, reverse the District Court's grant of dismissal, reinstate Plaintiff-Appellant's cause of

action for bad-faith conversion as against the Appellees. Furthermore, Plaintiff-Appellant's causes of action for declaratory judgment and replevin should be reinstated, and she should be granted leave to amend the complaint.

Dated: December 2, 2024
New York, New York

Respectfully submitted,

s/ Carter A. Reich
Carter A. Reich, Esq.
CARTER REICH, PC
*Attorneys for Appellant*
*Gwendolyn Clark*
106 W. 32nd Street, Suite 123
New York, New York 10001
(917) 615-0978
creich@reich.legal

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)/Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 7,813 words and contains 659 lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a:

proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  December 2, 2024
      New York, New York         s/ Carter A. Reich
                                   Carter A. Reich, Esq.
                                   *Attorneys for Appellant*
                                   *Gwendolyn Clark*